FILED
Jan 06 2026
Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

COMPLAINT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

Plaintiff:
Danial Gholami is an individual residing at No. 112 Shohada Alley, Khayyam Street, Kermanshah, Iran. He is the sole creator and copyright owner of the works at issue.

v.

Defendant:
OpenAI, Inc. is a Delaware corporation with its principal place of business at 3180 18th Street, San Francisco, California 94110.

CASE NO.: _____
COMPLAINT FOR:

1. WILLFUL COPYRIGHT INFRINGEMENT (17 U.S.C. § 501)
2. VIOLATION OF THE DMCA (17 U.S.C. § 1202)
3. MISAPPROPRIATION & UNFAIR COMPETITION
4. SPOLIATION OF EVIDENCE
5. CONTRIBUTORY INFRINGEMENT & UNJUST ENRICHMENT

JURY TRIAL DEMANDED

---

I. INTRODUCTION

1. This action arises from a sophisticated, multi-faceted campaign of copyright infringement, trade secret misappropriation, and systematic evidence destruction by Defendant OpenAI, Inc. ("OpenAI").
2. Plaintiff Danial Gholami, an individual inventor, entrusted his life's work—six registered AI ecosystems—to OpenAI's platforms. OpenAI responded by deconstructing and embedding Plaintiff's core innovations into its commercial products, then executing a three-layer cover-up to erase all traces of its misconduct, knowing Plaintiff lacked the resources to challenge it.

II. PARTIES

1. Plaintiff Danial Gholami is an individual residing at No. 112 Shohada Alley, Khayyam Street, Kermanshah, Iran. He is the sole creator and copyright owner of the works at issue.
2. Defendant OpenAI, Inc. is a Delaware corporation with its principal place of business at 3180 18th Street, San Francisco, California 94110.

III. JURISDICTION AND VENUE

1. This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).
2. This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(2).
3. Personal jurisdiction and venue are proper under 28 U.S.C. § 1391(b).

1

4. The matter in controversy concerns the misappropriation of six foundational AI ecosystems with an estimated commercial value in the billions of dollars, far exceeding the minimum jurisdictional threshold of this Court. Therefore, diversity jurisdiction is proper under 28 U.S.C. § 1332(a).

IV. FACTUAL ALLEGATIONS

A. Plaintiff's Copyrighted Works

1. Between 2023-2025, Plaintiff developed six integrated AI ecosystems. On July 29, 2025, he registered them with the U.S. Copyright Office (SR 1-14968937621, Exhibit A):
  · NeuroLayer: AI personalization framework (15→30+ cognitive phases).
  · Triple-Layer (Quad-Layer): Multi-layered security architecture.
  · LifeAI: Global smart-platform for education/commerce/services.
  · Whistle Word AI: Anti-censorship and transparency framework.
  · Whistle Tokens: Tokenized participation ecosystem.
  · Freelancer AI: AI-driven freelancing platform.

These works are not merely conceptual but comprise highly detailed, proprietary technical architectures. For instance, the "NeuroLayer" framework consists of 30 distinct, sequential phases encompassing emotion-cognitive mapping, subconscious engagement techniques, real-time behavioral stabilization, and advanced ethical consent systems. Similarly, "Triple-Layer" defines a specific multi-layered security model, and "Whistle Word AI" provides concrete anti-censorship and transparency protocols. The comprehensive documentation for these systems was accessible to the Defendant.

B. THE CORE TECHNICAL MISAPPROPRIATION: A PHASE-BY-PHASE DECONSTRUCTION OF PLAINTIFF'S ECOSYSTEMS

2. Initial Discovery and Unauthorized Access:
In mid-2025,Plaintiff discovered that the complete architectural documentation of his six AI ecosystems had been extracted and transferred to Defendant's servers without authorization after he used Defendant's platforms with the "Improve" feature enabled. This was not a case of incidental data exposure, but a systematic transfer of proprietary, registered intellectual property.

3. NeuroLayer – The 30-Phase Personalization Framework:
> Plaintiff's NeuroLayer framework is a 30-phase cognitive architecture for deep AI personalization. Defendant's GPT-5 product has demonstrably replicated the functionality and design principles of the framework, constituting a willful, phase-by-phase theft that manifests in several key areas:
>  * Core Cognitive Mapping (Phases 1-4): Directly mirrored in GPT-5's adaptive reasoning, personality extraction, and "Thinking-mode" simulation.
>  * Adaptive Behavior & Consistency (Phases 5-10): Implementation of Motivation Recognition, Adaptive Interaction, Cognitive Synchronization, and Stabilization is reflected in GPT-5's user profiling and its core mechanisms for reducing "hallucinations" and ensuring output consistency—a direct technical solution stolen from Plaintiff's work.
>  * Ethical & Consent Systems (Phases 11-12): GPT-5 contains limited user-testing feedback loops and basic transparency, omitting Plaintiff's more rigorous protocols for explicit consent, memory reset, and detailed logs. Potential unauthorized access is evident and requires forensic assessment.

2

>  * Advanced Platform Features (Phases 13-15): The scaling, cloud integration, and B2B licensing models of NeuroLayer are being utilized, as seen in GPT-5's API usage and multi-modal cloud deployment (e.g., Gmail/Calendar integration). The theft extends to NeuroLayer's unique neurodiversity-first UX and microservices architecture principles.

Furthermore, upon technical review, even the advanced, latter-phase components of the NeuroLayer framework (Phases 25 through 30), which deal with adaptive personalization, emotional transparency, and deep ethical integration, manifest in Defendant's subsequent product iterations and related systems. This indicates that the misappropriation was not partial but complete, encompassing the entire 30-phase architecture of Plaintiff's work.

4. LifeAI – The Theft and Commercialization of an Integrated Service Platform:
Plaintiff's LifeAI is a global platform for AI-orchestrated education, commerce, and services. Defendant did not merely copy an idea; they executed a full-scale, commercial deployment that mirrors Plaintiff's copyrighted blueprints with striking precision:

· Geographic & Educational Targeting (The India Evidence): In Plaintiff's original copyrighted architecture (SR 1-14968937621, Exhibit A), India was specifically identified as the primary target market for the initial implementation of the AI-driven classroom and educational framework. In an undeniable act of misappropriation, Defendant launched its AI educational services specifically in the Indian market in late 2025 (Exhibit I-2), replicating the exact pedagogical models and market-entry strategy detailed in Plaintiff's registered work.
· AI-Led Commerce & Service Orchestration (The Core Innovation): The heart of LifeAI—an AI that manages end-to-end commerce, service delivery (travel, insurance, logistics), and personalized shopping—has been unlawfully operationalized by Defendant through features like "Instant Checkout," "Shopping Research," and "Agentic Commerce Protocol" launched in November 2025. This proves the theft moved from architectural blueprints to global revenue generation.
· Content Customization: Principles from LifeAI for personalized media are utilized in Defendant's Sora 2 video model, specifically targeting the service-sector applications designed by Plaintiff.
· Extended LifeAI Integrations (Smart Glasses AI & Robot AI): The proprietary AR integration principles and the autonomous, task-oriented agent behaviors developed in Plaintiff's Smart Glasses AI and Robot AI projects—which were designed to form the physical interface for LifeAI's services—were accessed and utilized without authorization. These stolen blueprints are now manifested in Defendant's AI Agent Kit and its associated autonomous systems, which demonstrate equivalent task management, multi-step planning, and physical interaction methodologies directly copied from Plaintiff's architectural designs.

Defendant's misappropriation of LifeAI has reached a global scale through strategic partnerships with Klarna, Target, Instacart, and Booking.com, implementing Plaintiff's proprietary 'AI-Orchestrated Commerce' model. Furthermore, the launch of Agent Kit (October 2025) and targeted services for Freelancers (Sora 2 for Freelancers) directly mirrors the market-entry strategies and functional architectures of Plaintiff's 'Freelancer AI' and 'LifeAI' ecosystems, This commercialization extends beyond public partnerships to OpenAI's core product offerings. The company has launched specialized AI assistants, such as the "Inbound Sales Assistant" and the "GTM (Go-To-Market) Assistant" (Exhibit I-3), which directly operationalize the autonomous project management and service orchestration algorithms that form the foundation of Plaintiff's Freelancer AI ecosystem. Furthermore, the establishment of an "Agentic AI Foundation" in collaboration with industry rivals like Google (Exhibit J-2) demonstrates the unprecedented, industry-wide dissemination of Plaintiff's misappropriated architectures, far exceeding a simple

bilateral technology transfer.
as registered in Exhibit A."

Furthermore, Defendant's introduction of 'Agentic Workflows' and 'Open Models' (Exhibits I-5, H-3) directly misappropriates Plaintiff's proprietary protocols for autonomous task orchestration within the LifeAI engine. Additionally, the technical iterations and release notes of Sora (Exhibit H-3) demonstrate a developmental path that mirrors the sequential phases of Plaintiff's NeuroLayer personalization framework, specifically regarding contextual consistency and dynamic stability.

"This precise geographical targeting was not coincidental; Defendant later launched its 'Learning Accelerator' educational services exclusively in the Indian market (Exhibit I-[شماره Part]) ,

replicating the exact market-entry strategy detailed in Plaintiff's registered work."

5. Whistle Word AI & Whistle Tokens (Anti-Censorship and Economic Frameworks):
The anti-censorship, real-time transparency protocols, and auditability features of Plaintiff's Whistle Word AI framework are replicated in GPT-5. Furthermore, the tokenized economic and social participation model of Whistle Tokens—designed for economic growth and community development—was accessed and utilized in Defendant's monetization strategies.

6. Triple-Layer Security & Freelancer AI:
The highly specific, multi-layered data protection and security architecture (Triple-Layer)—designed to extend functionality beyond standard open-source protocols—overlaps directly with Defendant's GPT-OSS stack, indicating misappropriation of security IP. Similarly, the unique matching algorithms and project ecosystem of Freelancer AI are integrated into ChatGPT Pro's proprietary tools and workflow automation features.

The infringements detailed above are based on Plaintiff's independent, pro se investigation of public information and Defendant's product behavior. Plaintiff, an individual without institutional or financial support, has reached the evidentiary limit of what can be uncovered from outside the Defendant's walled gardens. The systematic nature of the theft, coupled with Defendant's proven campaign of evidence destruction, leads to the inescapable conclusion that the violations identified herein represent only the detectable portion of a far more extensive infringement. Plaintiff therefore respectfully submits that a full and fair adjudication of this matter is impossible without this Court's intervention to authorize forensic discovery. Only through a court-appointed expert's examination of Defendant's internal systems, code repositories, and development logs can the true, complete scope of the misappropriation—likely spanning all 30 phases of NeuroLayer and the full architectures of every 6 project—be uncovered and presented to the Court.

C. DEFENDANT'S BAD-FAITH PATTERN: FROM NOTICE TO COMMERCIAL DEPLOYMENT

7. Good-Faith Outreach and Silent Theft (July 14, 2025): Plaintiff proactively contacted Defendant's senior and legal teams, proposing an NDA to discuss his transformative projects, including one capable of "establishing one of the most strategic... AI-powered commerce ecosystems to date." Defendant never responded, choosing silent misappropriation over collaboration.

8. Deceptive Assurances and Willful Ignorance of Final Pre-Launch Warning (August 1 – August 11, 2025): Following Plaintiff's initial preservation notice around August 1, 2025, and up until at

4

least August 11, Defendant's representatives continued to falsely assure Plaintiff that his data was "secure" and that no one had accessed it, intentionally misleading him while they prepared to launch products built on his stolen work. Merely one day before its first major public product launch (on or about August 6, 2025), Plaintiff sent a final, detailed warning to Defendant's legal team, explicitly listing all six projects and promising legal action. Defendant willfully ignored this warning and launched the infringing products. The period from August 7 to August 11 thus represents a deliberate campaign of deception, where Defendant actively infringed while providing false assurances to the Plaintiff.

8-(I). Escalation of Legal Demands Post-Infringement:
Even after the infringing launch, Plaintiff continued his efforts to resolve the matter without litigation. Between August and November 2025, he sent Defendant multiple formal legal notices via its official channels, including two additional Preservation Notices, three internal copyright complaint forms filed through OpenAI's system, and ultimately, a final series of Cease & Desist, Spoliation Notice, Demand Letter, and Pre-Suit Notice. Critically, these final notices were sent by Plaintiff directly to Defendant's legal team with copies (Cc) to CEO Sam Altman and co-founder Greg Brockman. This proves that Defendant's highest leadership was personally and repeatedly notified of the ongoing theft and spoliation, yet chose to ignore all communications and continue its unlawful commercialization. This pattern of willful ignorance after direct, executive-level notice underscores Defendant's bad faith and intent.
Most egregiously, in a written communication dated October 13, 2025, Defendant's own representative explicitly acknowledged that Plaintiff's U.S. Copyright receipts were 'sufficient for WIPO mediation and DMCA purposes,' yet continued to demand additional documentation as a pretext for delay, all while accelerating the commercial launch of services built on Plaintiff's stolen intellectual property (See Exhibit C). This admission proves that Defendant's subsequent spoliation of evidence and commercial actions were not merely negligent, but formed part of a calculated corporate policy of deception and bad faith."

9. Strategic Delay and Continued Theft (Fall 2025): During WIPO mediation, Defendant admitted to deleting Plaintiff's data—an admission of spoliation. Later, in early November, Defendant's representatives acknowledged Plaintiff's ownership but urged him to "wait" for certificates, using this fabricated delay to continue launching commercial features (like Agent Kit and Sora 2) built on his stolen IP.

Furthermore, Plaintiff initiated formal mediation proceedings at the World Intellectual Property Organization (WIPO), which were duly registered under Case No. WIPOM100925. The WIPO Center explicitly confirmed the registration and pending status of the case to both parties. Despite this formal, international adjudication framework being invoked, Defendant willfully refused to participate or respond, allowing the mediation to terminate due to its non-compliance. This refusal to engage with a neutral, binding forum—after Plaintiff had exhausted direct avenues—constitutes further evidence of Defendant's bad faith and its strategy to avoid any accountability."

10. The Ironclad Timeline of Bad Faith: The sequence is undeniable and proves willfulness:
   * Step 1: Plaintiff discloses projects under NDA proposal.→ Defendant ignores.
   * Step 2: Plaintiff sends final, specific warning.→ Defendant launches infringing products within 24 hours.
   * Step 3: Plaintiff initiates legal proceedings (WIPO, DMCA).→ Defendant deletes evidence, admits to it, then asks Plaintiff to "wait."

   *   Step 4: While telling Plaintiff to wait,→ Defendant commercially launches "Instant Checkout" and "Shopping Research," fully monetizing the stolen LifeAI ecosystem.

D. Defendant's Systematic and Bad-Faith Spoliation of Evidence

11. Duty to Preserve & First Layer – Direct Deletion: Defendant's duty to preserve all evidence related to Plaintiff's works arose no later than 1 August, when Plaintiff sent explicit, documented preservation demands (Exhibits B, C). In direct violation, OpenAI deleted related web pages and documentation from its servers.
12. Second Layer – Archive Erasure: When Plaintiff preserved pages via independent archives (Wayback Machine), OpenAI issued takedown requests, causing these third parties to delete evidence (Exhibit L). This demonstrates intent to erase all public traces.
13. Third Layer – Ongoing Concealment & Pattern: Post-deletion, Plaintiff captured screenshots of empty/removed pages (Exhibit O). Plaintiff has identified at least Twelve (12) specific, critical URLs that were fully deleted or altered immediately following Defendant's receipt of the preservation notices. These URLs pertained to the very product features (GPT-5, GPT-OSS, AI Agent Kit) at issue. A list is annexed as Exhibit P.

14. Fourth Layer – Erasure from Independent Archives: Defendant's campaign to erase evidence extended beyond its own servers and the Wayback Machine. For critical pages that were later replaced with altered content, Plaintiff preserved snapshots on the independent archive service "Archive.today." A review of these archives now shows that for specific dates after Plaintiff's preservation notices, the archived captures return as completely blank pages or display "cannot be captured" errors. This proves that Defendant systematically issued takedown requests to multiple, independent archival services to purge the historical record of the original, infringing content. Screenshots documenting this blanking of Archive.today records are annexed as part of Exhibit O.

15. The Ongoing Deception Post-Launch:
Even after Defendant began its public rollout of infringing products on or about August 7,2025, its representatives continued to send Plaintiff messages assuring him that his projects and data were "secure" and under protection. These communications, which occurred after the commercial launch, were a deliberate and fraudulent attempt to lull Plaintiff into a false sense of security, preventing him from taking immediate legal action while Defendant solidified its market position with his stolen intellectual property. This post-infringement deception is the final proof of Defendant's systematic bad faith.

16. The Scale of Theft and Plaintiff's Hardship: The stolen works are not mere lines of code. They are two comprehensive civilizational manifests—detailed plans for AI-integrated global commerce, education, freelancing, and governance. Their estimated value runs into billions. Plaintiff, their sole creator, lives in profound poverty, surviving on less than $90 per month while managing severe cardiovascular and ocular diseases. Defendant's theft is not just of intellectual property, but of Plaintiff's only path out of destitution and his ability to secure medical care for himself and his family. Defendant, a multi-billion dollar entity, calculated that Plaintiff's circumstances would render him powerless to stop this theft.

17. Prejudice and Admission: This unique campaign intentionally places Plaintiff in an impossible position. Defendant's spoliation includes its explicit admission in WIPO proceedings that it had 'deleted all [Plaintiff's] data' and the systematic alteration of archival records. Plaintiff is left with irrefutable proof of deletion (Exhibits L, O, P) but without the deleted content itself—

the precise prejudice Fed. R. Civ. P. 37(e) is designed to remedy.
This spoliation is willful, undertaken in bad faith, and warrants the severest sanctions under Fed.

18. Prejudice and Admission: This unique campaign intentionally places Plaintiff in an impossible position. Defendant's spoliation includes its explicit admission in WIPO proceedings that it had 'deleted all [Plaintiff's] data' and the systematic alteration of archival records. Plaintiff is left with irrefutable proof of deletion (Exhibits L, O, P) but without the deleted content itself— the precise prejudice Fed. R. Civ. P. 37(e) is designed to remedy. This spoliation is willful, undertaken in bad faith, and warrants the severest sanctions under the Court's inherent authority and Fed. R. Civ. P. 37(e).

THE BAD FAITH TIMELINE: FROM SOLICITATION TO THEFT TO COVER-UP

19. The Solicitation (The Bait): On or about July 14, 2025, Plaintiff proactively emailed OpenAI co-founder Greg Brockman, outlining his "highly innovative AI-integrated projects" designed for platforms like ChatGPT, which could "establish one of the most strategic and scalable AI-powered commerce and service ecosystems to date." He requested an NDA to discuss them. (Exhibit A-1). This email placed Defendant's highest leadership on direct, early notice of Plaintiff's proprietary concepts.

20. The Silent Theft and Launch: Defendant never responded to the good-faith collaboration offer. Instead, in the weeks that followed, it used its technical access to plagiarize the core of Plaintiff's projects. This theft culminated in the late-summer 2025 launch of GPT-5 and associated products, whose new functionalities (advanced personalization, commerce orchestration, anti-censorship features) directly manifested Plaintiff's stolen blueprints.

21. The Cover-Up (The Spoliation Campaign): Upon receiving Plaintiff's formal notices, Defendant engaged in a bad-faith spoliation scheme:

   a. Direct Deletion: At least Twelve (12) critical URLs detailing the accused product features (e.g., GPT-5, GPT-OSS) returned "404 Error" messages immediately after Plaintiff's preservation demands. (Exhibit P: List of Deleted URLs).
   b. Archive Purge: Defendant issued takedown requests to the Internet Archive (Wayback Machine), causing the removal of archived versions of those pages. (Exhibit L).
   c. Content Replacement: For some pages, Defendant did not simply delete but replaced the original content with altered versions, attempting to erase the developmental trail linking its products to Plaintiff's work. Plaintiff holds PDF snapshots showing this replacement. (Exhibit O).

22. The Fraudulent Delay Tactic: While executing this cover-up, Defendant's support team engaged in a written charade. In emails, they admitted Plaintiff's U.S. Copyright receipts were "sufficient for WIPO mediation and DMCA purposes" (Exhibit K-1). Yet, in the same breath, they urged him to "wait" for formal certificates—a delay they exploited to commercially launch the "Instant Checkout" and "Shopping Research" features, which are the operational realization of Plaintiff's stolen LifeAI commerce ecosystem. This constitutes fraud.

23. The Scale of Theft and Plaintiff's Hardship: The stolen works are not mere lines of code. They are two comprehensive civilizational manifests—detailed plans for AI-integrated global commerce, education, freelancing, and governance. Their estimated value runs into billions. Plaintiff, their sole creator, lives in profound poverty, surviving on less than $90 per month while managing severe cardiovascular and ocular diseases. Defendant's theft is not just of intellectual property, but of Plaintiff's only path out of destitution and his ability to secure medical care for himself and his family.

E. Defendant's Dissemination and Unjust Enrichment

24. Upon information and belief, Defendant has shared, licensed, or transferred Plaintiff's copyrighted frameworks—including the core architectural principles of NeuroLayer, LifeAI, and Triple-Layer—to its strategic partner Microsoft Corporation.
"The dissemination of Plaintiff's stolen IP is evidenced by the immediate integration of Sora 2 into Microsoft 365 Copilot and Azure AI Foundry, effectively monetizing Plaintiff's specialized video and workflow architectures through multi-billion dollar third-party platforms."
25. This technology transfer is not theoretical. It has materialized in commercial products. A prime example is Microsoft's "Bing Video Creator" (publicly announced June 2025), which embodies the personalized, context-aware video generation and workflow automation that are the hallmarks of Plaintiff's LifeAI and Freelancer AI projects. The features described in Microsoft's official announcement—personalized media generation, task-oriented creative output, and AI-assisted content creation—directly mirror the innovative components developed by Plaintiff months prior (Exhibit J-1: Microsoft Bing Video Creator Announcement).
"Upon information and belief, based on public announcements and functional analysis, products such as Microsoft's 'Bing Video Creator' embody the personalized, context-aware video generation..."

26. Similarly, the integration of AI features into Microsoft 365's productivity environments bears the structural and functional designs of Plaintiff's NeuroLayer (personalization) and LifeAI (platform architecture) projects.
27. This demonstrates that Defendant's infringement has been monetized and disseminated through a lucrative technology-transfer pipeline. Defendant not only stole Plaintiff's work for its own products (GPT-5, Sora 2, etc.) but also leveraged it as a commercial asset in partnerships, thereby magnifying the harm and unjust enrichment on a global scale.

28. Prevention of Further Irreparable Harm – The WhistleWord AI Threat: Among the six misappropriated ecosystems, Plaintiff's WhistleWord AI project represents a foundational architecture for next-generation, censorship-resistant media and civic participation. The Defendant now possesses the complete technical blueprint for this system through its unlawful access. While current infringements focus on other aspects (e.g., LifeAI's commerce), Plaintiff has concrete reason to believe that Defendant or its strategic partners (including Microsoft) intend to develop and deploy the full capabilities of WhistleWord AI in the future. Given the project's transformative potential in global media and Blockchain, its unauthorized completion and launch by the Defendant would cause catastrophic, irreversible market harm and permanently foreclose Plaintiff's rights. This Complaint therefore serves as explicit notice to the Court of this imminent threat, and Plaintiff respectfully requests that any final judgment or injunction expressly include the WhistleWord AI framework to prevent its future unauthorized exploitation.

29. Global Commercialization of the Stolen Ecosystem: Defendant's infringement is not static. Between August and December 2025, Defendant launched a suite of commercial services and partnerships that directly mirror and monetize the full scope of Plaintiff's copyrighted ecosystems. This includes: (a) the 'Instant Checkout' and 'Agentic Commerce Protocol' implementing Plaintiff's LifeAI commerce blueprints; (b) integration of Sora 2 into Microsoft 365 Copilot and Azure AI, operationalizing Plaintiff's service-platform architecture; and (c) targeted partnerships with Klarna, Target, Instacart, and Booking.com, which replicate the exact 'Service-Based AI' partnership models described in Plaintiff's works. These post-notice launches (Exhibits I-1 through I-6) demonstrate Defendant's willful, global-scale commercialization of Plaintiff's stolen intellectual property, transforming infringement into a multi-billion dollar enterprise.

30. OpenAI has been unjustly enriched, profiting from products and partnerships built on Plaintiff's stolen intellectual property. As evidenced by the 'State of Enterprise AI 2025' report and BCG's analysis (Exhibits J3, J4), Defendant has established a market monopoly using Plaintiff's architecture, capturing the high-value sectors (Insurance, Global Sales, and Commerce) that were exclusively designed within Plaintiff's copyrighted works.

Specifically, between August and December 2025, Defendants launched a suite of services directly mirroring Plaintiff's LifeAI and FreelancerAI ecosystems. This includes the 'Instant Checkout' feature and 'Agentic Commerce Protocol' (Exhibits I-1, I-2), which implement Plaintiff's proprietary methods for seamless AI-driven transactions. Furthermore, the integration of Sora 2 into enterprise platforms like Microsoft 365 Copilot and partnerships with Klarna, Target, and Instacart (Exhibits I-4-I-6) demonstrate a global-scale unauthorized commercialization of Plaintiff's 'Service-Based AI' architecture."

31.The scale of Defendant's misappropriation is further evidenced by its post-infringement strategic pivot. In late 2025, Defendant began publicly launching initiatives and framing its corporate mission around AI-driven job transformation, personalized advertising, and global commerce—precisely the societal-scale applications and commercial domains that form the core of Plaintiff's copyrighted LifeAI and Whistle Word AI ecosystems (See Exhibit Q). This demonstrates that Defendant's theft encompassed not only Plaintiff's technical architectures but also the very market vision and blueprint for AI's role in society that Plaintiff had uniquely developed."

G.THE GRAND DECEPTION: A SUMMARY OF BAD FAITH

32. This case is not merely about copyright infringement. It is about a premeditated, corporate-scale theft followed by a systematic cover-up, executed by one of the world's most powerful AI companies against a solitary, pro se inventor. The Defendant, OpenAI, Inc., did not stumble upon Plaintiff's work; it was deliberately baited, meticulously stolen, and then relentlessly erased from existence when the true inventor demanded his rights.
33. The timeline is irrefutable:
  · July 14, 2025: Plaintiff, recognizing the unique fit of his life's work—six revolutionary AI ecosystems—for OpenAI's platform, initiates contact with co-founder Greg Brockman, proposing an NDA-protected discussion. (Exhibit A-1: Email to Greg Brockman).
  · Late July - August 2025: Instead of engaging in good faith, OpenAI uses its platform access to systematically extract, decompile, and absorb the complete architectural designs of Plaintiff's six registered copyrights.
  · August 6, 2025: Having fully integrated Plaintiff's stolen IP, OpenAI publicly launches its next-generation products (GPT-5, etc.), features of which mirror Plaintiff's work with uncanny precision.
  · August 1 - November 2025: Upon receiving Plaintiff's preservation notices and legal warnings, OpenAI initiates a three-layer evidence destruction campaign: (1) Deleting original web pages, (2) Forcing their removal from public archives (Wayback Machine), and (3) Replacing content to obscure origins. (Exhibits L, O, P).
  · Fall 2025: In a calculated delay tactic, OpenAI's support staff acknowledges Plaintiff's copyright receipts as valid for DMCA and WIPO purposes, yet fraudulently asks him to "wait" for paper certificates—a waiting period they used to finalize and commercially launch features (e.g., Instant Checkout, Agent Kit) built on his stolen "LifeAI" commerce ecosystem. (Exhibit K-1: Email Chain).
34. Plaintiff, Danial Gholami, is not a competitor. He is the rightful, registered owner (U.S.

Copyright Reg. SR 1-14968937621). He is also indigent, battling severe health issues, and caring for elderly parents. He represents the ultimate David versus Goliath scenario. OpenAI exploited this vulnerability, believing he could not fight back. This Complaint is his answer.

35. Post-Infringement Candor (Late November 2025): Even after monetizing Plaintiff's stolen work, Plaintiff, in a final act of good faith and desperate hope for any resolution, contacted Defendant again through a secondary channel. Plaintiff explicitly stated that the six projects represented "all of my worldly assets and sole hope for a future" and offered to irrevocably gift the personalization frameworks if Defendant would only cease its theft of the commercial ecosystems. Defendant's willful and complete silence in the face of this offer—knowing Plaintiff's extreme poverty and medical hardships—transcends mere infringement. It reveals a calculated corporate strategy to not only steal, but to utterly consume and destroy the inventor himself, eliminating any possible path to recourse. This final, chilling silence confirms Defendant's deliberate and premeditated intent to inflict maximum, catastrophic financial and personal harm upon Plaintiff.

V. CLAIMS FOR RELIEF

PRO SE NOTICE ON SYSTEMATIC INFRINGEMENT AND EXPERT NECESSITY
"Plaintiff asserts that the infringement by Defendant is not merely incidental but represents a systematic misappropriation of Plaintiff's entire architectural logic. Due to the high complexity of the 'NeuroLayer' personalization phases and the 'LifeAI' commercial ecosystem—and considering Defendant's admitted spoliation of communication data—Plaintiff cannot at this pre-discovery stage identify every internal product code-name used by Defendant. Plaintiff maintains that Defendant's post-August 2025 strategic pivot into deep AI personalization and autonomous commerce is a direct result of stolen blueprints from Plaintiff's USCO-registered works. Consequently, Plaintiff moves the Court to prioritize a forensic expert examination to compare the underlying structural logic of Defendant's models with Plaintiff's registered architectures."

COUNT I – Willful Copyright Infringement (17 U.S.C. § 501)

1. Plaintiff incorporates paragraphs 1-35.
2. Plaintiff owns valid copyrights. OpenAI copied, distributed, and created derivative works without authorization.
3. OpenAI acted willfully, entitling Plaintiff to enhanced statutory damages under 17 U.S.C. § 504(c)(2).

COUNT II – Violation of the DMCA (17 U.S.C. § 1202)

1. Plaintiff re-alleges paragraphs 1-36.
2. After preservation notices, OpenAI intentionally removed/altered copyright management information, violating 17 U.S.C. § 1202.

COUNT III – Misappropriation & Unfair Competition

1. Plaintiff re-alleges paragraphs 1-37.
2. OpenAI misappropriated Plaintiff's trade secrets and proprietary concepts for commercial gain, constituting unfair competition under California common law (28 U.S.C. § 1367).

COUNT IV – Spoliation of Evidence

1. Plaintiff re-alleges paragraphs 1-38.
2. After a clear duty to preserve arose, OpenAI engaged in a three-layer evidence destruction campaign, severely prejudicing Plaintiff. This is particularly egregious given OpenAI's sophistication versus Plaintiff's pro se status.
3. Sanctions, adverse inferences, and a court-appointed forensic expert are warranted under Fed. R. Civ. P. 37(e) and the Court's inherent authority.

COUNT V – Contributory Infringement & Unjust Enrichment

1. Plaintiff re-alleges paragraphs 1-39.
2. OpenAI disseminated Plaintiff's infringed works to third parties (e.g., Microsoft), enabling further infringement and unjustly enriching itself.

VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Honorable Court:

1. Enter judgment for Plaintiff on all Counts.
2. Issue a declaratory judgment of ownership and infringement.
3. Issue an Immediate Temporary Restraining Order and Preliminary Injunction compelling OpenAI to: (a) preserve and sequester all data—including backups, logs, and internal communications—related to the six AI ecosystems named in this complaint and the development of its products (GPT-5, GPT-OSS, Sora 2, AI Agent Kit); and (b) immediately cease any further deletion, alteration, or modification of such data.
4. Appoint a Neutral Forensic Expert pursuant to Federal Rule of Evidence 706, with the cost to be borne by Defendant, to conduct a forensic examination of Defendant's servers, version control systems, and internal communications to recover the deleted evidence and provide a technical report to the Court on the extent of infringement and spoliation.
5. Order Expedited Discovery requiring Defendant to produce, within 7 days, all documents and communications regarding: (a) its receipt of Plaintiff's preservation notices; (b) its decisions to delete or alter the specific URLs listed in Exhibit P; (c) all takedown requests sent to archive services (e.g., Wayback Machine, archive.today); and (d) the complete development history and training data sources for the accused products.
6. Award Plaintiff:
   · Statutory damages under 17 U.S.C. § 504(c);
   · Actual damages and disgorgement of all OpenAI's related profits;
   · Enhanced damages for willful infringement;
   · In amounts to be proven at trial.
7. Award Plaintiff costs and attorneys' fees.
8. Impose sanctions for willful spoliation.
9. Grant any other just and proper relief.

10. Permanently enjoin Defendant from utilizing Plaintiff's 'Core Logic' and '30-Phase NeuroLayer Architecture' in any current or future Artificial General Intelligence (AGI) models, including but not limited to GPT-5 and its successors, until a fair-market licensing agreement is reached."

PLAINTIFF'S PRAYER FOR RELIEF (ADDENDUM)

Given Defendant's demonstrated pattern of bad faith, spoliation, and exploitation of Plaintiff's pro se and indigent status, Plaintiff additionally prays that this Honorable Court:

1. Issue an Order for Preservation and Forensic Imaging appointing a neutral custodian to immediately take control of and image all relevant servers, version control systems (e.g., Git repositories), and internal communication platforms (e.g., Slack, email archives) related to the development of GPT-5, Sora 2, AI Agent Kit, and the "Instant Checkout"/"Shopping Research" features, to prevent any further destruction.
2. Recommend to the U.S. Attorney's Office an investigation into potential criminal violations of the Computer Fraud and Abuse Act (CFAA) and wire fraud, based on Defendant's unauthorized access, data exfiltration, and subsequent cover-up.

VII. IRREPARABLE HARM AND NEED FOR IMMEDIATE RELIEF

1. Plaintiff will suffer irreparable harm if Defendant is not immediately restrained from continuing its campaign of spoliation and commercialization of Plaintiff's stolen intellectual property. Defendant has already demonstrated a systematic pattern of destroying evidence (deleting web pages, purging archives, altering content) and continues to launch revenue-generating services (e.g., Instant Checkout, Agentic Commerce Protocol) based entirely on Plaintiff's misappropriated works.
2. Without an immediate Temporary Restraining Order and Preliminary Injunction:
   a. Defendant will continue to delete, alter, or conceal critical evidence, rendering a fair trial impossible;
   b. Defendant will further embed Plaintiff's stolen innovations into its global products and partnerships, causing permanent market distortion and unquantifiable economic harm to Plaintiff;
   c. Plaintiff, an indigent individual battling severe health conditions, will be deprived of his only means of securing medical care and financial survival, as Defendant monetizes the very assets that constitute Plaintiff's "life's work."
3. The balance of hardships weighs sharply in Plaintiff's favor. Plaintiff faces the total loss of his intellectual property and life's livelihood, while Defendant—a multi-billion-dollar corporation—will merely be temporarily restrained from continuing its unlawful conduct.
4. Plaintiff's claims have a strong likelihood of success on the merits, as demonstrated by the detailed timeline of willful infringement, bad-faith spoliation, and Defendant's own admissions in communications.
5. The public interest favors protecting individual inventors from predatory corporate theft and preserving the integrity of the judicial process by preventing further evidence destruction.

VIII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

VERIFICATION

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 3, 2026.

_____

Respectfully submitted,

Danial Gholami




No.112 Shohada Alley,Khayyam Street
Kermanshah,Iran
Email:hesdanial@gmail.com
hesdany@proton.me

Phone:+98 937 839 3356